*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIAM JOSEPH TURNER,

        Defendant-Appellant.

UNPUBLISHED
September 29, 2022

No. 355482
Genesee Circuit Court
LC No. 18-043837-FH

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIAM JOSEPH TURNER,

        Defendant-Appellant.

No. 355497
Genesee Circuit Court
LC No. 18-043838-FC

Before: K. F. KELLY, P.J., and LETICA and RICK, JJ.

PER CURIAM.

In Docket No. 355482, defendant appeals as of right his jury trial convictions of resisting or obstructing a police officer, MCL 750.81d(1), breaking and entering, MCL 750.115(1), and assault and battery, MCL 750.81(1), for which he was sentenced as a fourth-offense habitual offender, MCL 769.12, to 120 to 180 months' imprisonment for the resisting or obstructing a police officer conviction, 90 days' jailtime for his breaking and entering conviction, and 93 days' jailtime for his assault and battery conviction. In Docket No. 355497, defendant appeals as of right

-1-

his jury trial convictions[1] of first-degree premeditated murder, MCL 750.316(1)(a), and first-degree home invasion, MCL 750.110a(2), for which he was sentenced to life without the possibility of parole and 320 to 600 months' imprisonment, respectively. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

These cases arose out of altercations between defendant, Barbara Zrakovi, Ronald Chadwell, and the police, on the night of May 29, 2018, and during the early morning hours of June 3, 2018. Zrakovi and Chadwell lived together in a home ("the Zrakovi house") on the same street defendant lived. On May 29, 2018, defendant was at the Zrakovi house when an altercation occurred. Zrakovi became upset with defendant when he started throwing his cell phone around the house, and it struck the cage of her pet rabbit. Zrakovi ordered defendant out of her home, which caused defendant to become upset. He responded by throwing a mostly full beer can at Zrakovi, which struck her face, and kicking in the front door to the Zrakovi house. Chadwell interrupted the fight by telling defendant to leave their property while holding a baseball bat; Zrakovi called 911. Defendant returned home.

The police responded to Zrakovi's 911 call, and she directed them to defendant's home. The police could see defendant inside his home where he was observed breaking a mirror with his hand. Defendant refused to answer the door. The police remained at the scene as they prepared a report. Eventually, defendant appeared on his driveway with a sandwich. He refused to respond to police commands, became aggressive and threatening toward the police, and ultimately had to be subdued by use of a taser. Defendant suffered an injury when his head struck the driveway after being tased. Despite incurring a wound, defendant continued to resist and assault police officers by kicking, spitting, and biting those officers who came close to him. Defendant eventually had to be sedated at the hospital to receive care for his injuries.

Defendant was released from jail on bond on June 1, 2018, after being arraigned on the charges arising from the incident that occurred at the Zrakovi home as well as the contacts with the police. After learning of his release, Zrakovi and Chadwell were afraid because of defendant's penchant for anger and history of retaliatory violence.

On the evening of June 2, 2018, defendant began a rampage through the neighborhood. Neighbor Christopher Wiseley, who lived with his father, Doug Wiseley, near the Zrakovi home, described how his house was twice vandalized by defendant when Christopher refused to open the front door for him. Eventually, after midnight now on June 3, 2018, defendant went to the gas station where Zrakovi worked. She testified defendant initially attempted to apologize, but she

---

[1] Although the crimes occurred on different dates, they were jointly tried before one jury. For efficiency purposes, defendant's appeals were consolidated. *People v Turner*, unpublished order of the Court of Appeals, entered November 24, 2020 (Docket Nos. 355482 and 355497).

rebuffed the attempt. Defendant became angry, punched some glass, and told Zrakovi he was going to give Chadwell "a new way of living."[2]

Zrakovi called to warn Chadwell of defendant's presence in the neighborhood and threatening behavior. Chadwell agreed to take extra precautions to protect himself. When Zrakovi tried to contact Chadwell again later in the morning, Chadwell did not answer his cell phone. Growing concerned, Zrakovi called Christopher and asked him to go check on Chadwell. Christopher agreed and brought a baseball bat for protection. When he arrived, the Zrakovi house was completely dark, and no one answered the front door. Christopher walked to the back and found the sliding-glass, patio door broken out. Christopher fled the scene, told Zrakovi to call 911, and began walking home. When he saw police in the neighborhood, Christopher tossed his baseball bat into some high grass in an abandoned lot because he was anxious.[3]

When police eventually arrived at the Zrakovi residence, they found Chadwell had been killed. Police described the scene as incredibly bloody. Chadwell's head had been smashed with a blunt force object to the point where his brain matter was visible. Police also found a metal sewer cap in the home, which they suspected had been used by the intruder to break the patio door, and several weapons, which were collected as evidence. None of the weapons found inside the home contained defendant's DNA, but Zrakovi testified the baseball bat Chadwell had used on May 29, 2018, was missing. Police believed this baseball bat likely was the murder weapon and had been disposed of in some manner because it was never found. The sewer cap had defendant's DNA on it. A small safe was missing from the Zrakovi house, and defendant was one of only four people who knew of its location in the home. The medical examiner later confirmed Chadwell had been killed by blunt force trauma to the head, which could have been caused by a baseball bat. Importantly, Chadwell had a hair in his hand when his body was found, which was collected as evidence.

Police immediately identified defendant as a suspect and began searching for him. Further, because his bond conditions required him to have no contact with Zrakovi, a bench warrant was issued for his arrest. Defendant was arrested on June 8, 2018, and participated in a police interview on June 9, 2018. At some point later, the police searched the home of Harold Rappley, where defendant sometimes stayed, and found a pair of shoes belonging to defendant. Chadwell's blood was found on the outside of the shoes, while defendant's DNA was found inside of the shoes. Defendant was charged with murder and home invasion.

Before trial, defendant moved to suppress his statement to police, claiming a *Miranda*[4] violation, but the trial court denied the motion after holding a *Walker*[5] hearing. Later, defendant

---

[2] The encounter between Zrakovi and defendant at the gas station was captured on video, but there was no accompanying audio recorded.

[3] Christopher's baseball bat was found by police later, collected as evidence, and was found to have no human blood on it. As a result, it was not submitted for further testing.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[5] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

moved to suppress evidence found at Rappley's house, contending the bench warrant for his arrest was issued in violation of MCR 3.606(A)(2). The trial court also denied this motion, noting the exclusionary rule did not apply to violations of the court rule, and even if it did, the inevitable-discovery doctrine allowed for admission of any evidence that might otherwise be considered fruits of the poisonous tree.

After seeking the removal of three appointed attorneys, defendant asked the trial court if he could proceed to trial *in propria persona* with the assistance of standby counsel. After explaining to defendant his various constitutional rights and obtaining his waiver of his right to counsel, the trial court agreed to allow defendant to represent himself. Monica Wilson was named as standby counsel.

During the six-day trial, defendant reiterated his waiver of his right to counsel and assertion of his right to represent himself every day. The defense strategy was to focus the jury's attention on Christopher as a potential suspect in the home invasion and murder of Chadwell. Ultimately, the jury convicted defendant as noted. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant alleges he is entitled to reversal of his convictions and a new trial on the basis of Wilson's constitutionally defective assistance. We conclude that defendant waived this issue.

### A. PRESERVATION AND STANDARD OF REVIEW

It is undisputed defendant did not move the trial court for a new trial or a *Ginther*[6] hearing, and consequently, these issues are unpreserved. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015). "Appellate review of an unpreserved argument of ineffective assistance of counsel, like this one, is limited to mistakes apparent on the record." *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016). "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Schrauben*, 314 Mich App 181, 189; 886 NW2d 173 (2016), quoting *People v Brown*, 279 Mich App 116, 140; 755 NW2d 664 (2008).

### B. WAIVER

Defendant has waived his claims of ineffective assistance of counsel by exercising his right to represent himself with standby counsel.

"The United States Constitution, the Michigan Constitution, and MCL 763.1[7] each guarantee a criminal defendant the right to represent himself." *People v Kevorkian*, 248 Mich App

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[7] This statute, in its entirety, states:

> On the trial of every indictment or other criminal accusation, the party accused shall be allowed to be heard by counsel and may defend himself, and he

373, 417; 639 NW2d 291 (2001), citing US Const, Am VI; Const 1963, art 1, § 13. "Although not stated in the [Sixth] Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." *Faretta v California*, 422 US 806, 819; 95 S Ct 2525; 45 L Ed 2d 562 (1975). As noted, the same right is established by Michigan's Constitution, though in more explicit terms. *People v Dennany*, 445 Mich 412, 427; 519 NW2d 128 (1994), quoting Const 1963, art 1, § 13 ("A suitor in any court of this state has the right to prosecute or defend his suit, either in his own proper person or by an attorney."). To assert the right of self-representation, however, a defendant must waive the right to counsel, and such waiver "must be a knowing, intelligent act done with sufficient awareness of the relevant circumstances." *People v Williams*, 470 Mich 634, 641-642; 683 NW2d 597 (2004) (quotation marks, citations, and alteration omitted). While caselaw[8] and a court rule[9] address waivers of counsel and assertions of the right to represent oneself, such is not relevant in this case because defendant does not challenge his waiver of counsel and decision to represent himself.

Instead, defendant essentially submits that his decision to represent himself with the assistance of standby counsel should be treated as if Wilson were his constitutionally appointed counsel. Defendant is incorrect. "[A] defendant has a constitutional entitlement to represent himself or to be represented by counsel—but not both." *Kevorkian*, 248 Mich App at 422, quoting *Dennany*, 445 Mich at 442. In other words, the Constitution "permits the use of standby counsel as a matter of grace, but not as a matter of right." *Kevorkian*, 248 Mich App at 422 (quotation marks and citation omitted). "A defendant who asserts his right to self-representation has no absolute entitlement to standby counsel." *Id*. "There can be no question that the roles of standby counsel and full-fledged defense counsel are fundamentally different." *People v Willing*, 267 Mich App 208, 227; 704 NW2d 472 (2005), quoting *United States v Taylor*, 933 F2d 307, 312 (CA 5, 1991). In *Kevorkian*, 248 Mich App at 424, this Court held "a defendant who chooses to represent himself does so at his own peril," reasoning that, "[w]ith no constitutional right to an attorney, a defendant proceeding in propria persona has no basis to claim that the [standby] attorney must abide by constitutional standards." Simply put, when a "defendant cho[oses] to represent himself . . . he may not [] assign blame for his conviction to [standby counsel]." *Id*. at 426. Standby counsel does not act "as counsel within the meaning of the Sixth Amendment or Const 1963, art 1, § 13 and, therefore, cannot be held to the standards of effective assistance required of trial counsel." *Kevorkian*, 248 Mich App at 427.

As discussed, there is no dispute in this case defendant knowingly and voluntarily waived his right to counsel, asserted his right to represent himself, and accepted the assistance of Wilson as standby counsel. He does not now claim, nor has he ever, that his waiver or assertion of certain constitutional rights were improper or insufficient. Consequently, although Wilson essentially handled the entire trial for defendant, she was only acting as standby counsel. Because defendant was representing himself, "defendant preserve[d] actual control over the case he present[ed] to the

---

shall have a right to produce witnesses and proofs in his favor, and meet the witnesses who are produced against him face to face. [MCL 763.1.]

[8] See *People v Russell*, 471 Mich 182, 190-192; 684 NW2d 745 (2004).

[9] MCR 6.005(D).

jury: standby counsel cannot substantially interfere with any significant tactical decisions, cannot control the questioning of witnesses, and cannot speak in place of the defendant on any matter of importance." *Willing*, 267 Mich App at 227 (citations omitted). In this case, defendant chose to have Wilson perform nearly all aspects of the trial. He did so at his peril. *Kevorkian*, 248 Mich App at 424. Because Wilson "was not acting as counsel within the meaning of the Sixth Amendment or Const 1963, art 1, § 13," she simply "cannot be held to the standards of effective assistance required of trial counsel." *Kevorkian*, 248 Mich App at 427. As a result, defendant's two claims of ineffective assistance of counsel must fail. *Id*.

## III. *MIRANDA* VIOLATIONS

Defendant contends his statement to the police, and evidence seized from Rappley's house on the basis of information provided by defendant during the interrogation, should have been suppressed because police ignored his requests for counsel. We disagree.

## A. ISSUE PRESERVATION

To preserve an argument regarding suppression of a statement to police, "a defendant must challenge the admissibility of a [statement] in the trial court," typically by moving for a *Walker* hearing. *People v McCrady*, 244 Mich App 27, 29; 624 NW2d 761 (2000). Here, defendant moved to suppress his statement to police based on his requests for counsel. The trial court held a *Walker* hearing, accepted testimony, heard oral arguments, and eventually denied defendant's motion to suppress his statement to police. As a result, this issue is preserved for this Court's review. *McCrady*, 244 Mich App at 29. However, in addition to challenging the trial court's decision regarding suppression of his statement on these grounds, defendant also asserts the trial court should have suppressed evidence seized from Rappley's house as fruit of the poisonous tree. Defendant did not raise this argument in his briefing or at the *Walker* hearing. "A challenge on one ground before the trial court is not sufficient to preserve a challenge on another ground on appeal." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). "When a party raises a separate argument on appeal than the party raised before the trial court, the party must satisfy the standard for plain-error review." *Id*. Consequently, defendant's claim on appeal that the trial court erred by failing to suppress evidence found at Rappley's house because of the purportedly unconstitutional interrogation is not preserved. *Id*.

## B. STANDARD OF REVIEW

"A trial court's findings of fact on a motion to suppress are reviewed for clear error . . . ." *People v Hrlic*, 277 Mich App 260, 262-263; 744 NW2d 221 (2007). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Blevins*, 314 Mich App 339, 348-349; 886 NW2d 456 (2016). But when this Court considers "an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001). To the extent defendant argues evidence should have been suppressed as fruit of the poisonous tree, this unpreserved issue must be reviewed for plain error. *People v Borgne*, 483 Mich 178, 184; 768 NW2d 290 (2009), reh gtd in part on other grounds 485 Mich 868 (2009). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v*

*Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

## C. ANALYSIS

Defendant contends his statement to police should have been suppressed as well as evidence found as fruit of the poisonous tree. We conclude that defendant is not entitled to relief for two reasons. First, because defendant's statement was not admitted as evidence during trial, whether it should have been suppressed by the trial court is moot. Second, because the exclusionary rule does not apply to evidence seized as fruit of the poisonous tree arising from an interrogation in violation of *Miranda*, defendant's contention lacks legal merit unrelated to whether a violation of *Miranda* actually occurred.

As argued by the prosecution in its brief on appeal, the issue regarding suppression of defendant's statement has been rendered moot. "A dispute is moot if no controversy exists and any judgment on the matter would lack practical legal effect." *People v Smith*, 502 Mich 624, 631; 918 NW2d 718 (2018). Stated differently, "[a]n issue is moot when an event occurs that renders it impossible for the reviewing court to fashion a remedy to the controversy." *People v Warren*, 505 Mich 196, 202 n 1; 949 NW2d 125 (2020) (quotation marks and citation omitted). "It is well established that a court will not decide moot issues." *Smith*, 502 Mich at 631 (quotation marks and citation omitted). Indeed, this Court typically only addresses moot issues when "they are of public significance and are likely to recur, yet may evade judicial review." *Id*. at 631-632 (quotation marks and citation omitted).

Defendant contends the trial court erred by denying his motion to suppress his statement to police. During trial, however, the prosecution decided not to admit defendant's statement as evidence. The prosecution's decision in that regard was "an event [rendering] it impossible for" us to provide any remedy. *Warren*, 505 Mich at 202 n 1 (quotation marks and citation omitted). Pertinently, the remedy identified by defendant was to suppress his statement as evidence. Practically, this remedy meant the statement would not be able to be considered by the jury. The remedy, regardless of the trial court's decision, was provided by the prosecution's decision not to admit the statement as evidence. Consequently, this "dispute is moot [because] no controversy exists and any judgment on the matter would lack practical legal effect." *Smith*, 502 Mich at 631. Moreover, considering how often we consider whether a statement to police should be suppressed because of a violation of *Miranda*, there is no support for any contention this issue is "likely to recur, yet may evade judicial review." *Smith*, 502 Mich at 631-632 (quotation marks and citation omitted). In sum, this issue is moot, and we decline to consider it. *Id*.

Defendant also contends that evidence seized from Rappley's house should have been suppressed as a fruit of the poisonous tree rooted in the allegedly improper interrogation. Absent his interrogation in violation of *Miranda*, defendant insists, the police would never have known to search Rappley's home. This argument lacks legal merit.

"The Fifth Amendment of the United States Constitution provides that '[n]o person shall . . . be compelled in any criminal case to be a witness against himself . . . .'" *People v White*, 493 Mich 187, 193; 828 NW2d 329 (2013), quoting US Const, Am V, citing Const 1963, art 1, § 17. "In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that the accused be given a series of warnings before being subjected to 'custodial interrogation.' " *People v Elliott*, 494 Mich 292, 301; 833 NW2d 284 (2013). The Court in *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), clarified that: "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." One of the warnings announced in *Miranda* was related to "an accused's [] Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Edwards v Arizona*, 451 US 477, 482; 101 S Ct 1880; 68 L Ed 2d 378 (1981). "The right to counsel established in *Miranda* was one of a series of recommended procedural safeguards that were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Davis v United States*, 512 US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994) (quotation marks, citations, and alterations omitted).

A defendant, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 US at 484-485. In other words, "[o]nce a suspect invokes his right to remain silent or requests counsel, police questioning must cease unless the suspect affirmatively reinitiates contact." *People v Tanner*, 496 Mich 199, 208; 853 NW2d 653 (2014). "This second layer of prophylaxis for the *Miranda* right to counsel is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 US at 458 (quotation marks and citations omitted).

"However, the defendant's invocation of his right to counsel must be unequivocal." *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005). To the contrary, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 US at 459. "It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v Wisconsin*, 501 US 171, 178; 111 S Ct 2204; 115 L Ed 2d 158 (1991) (emphasis omitted). "Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 US at 461.

When a defendant's statement is taken in violation of *Miranda*, it cannot be used against the defendant at trial. *Tanner*, 496 Mich at 207-208. Generally, "[t]he exclusionary rule . . . reaches not only primary evidence that is obtained as a direct result of an illegal search or seizure, but also evidence that is discovered later and found to be derivative of the illegality, i.e., fruit of the poisonous tree." *People v Hammerlund*, 337 Mich App 598, 606-607; ___ NW2d ___ (2021). However, "[p]olice do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings

prescribed by *Miranda*." *People v Campbell*, 329 Mich App 185, 204-205; 942 NW2d 51 (2019), quoting *United States v Patane*, 542 US 630, 641; 124 S Ct 2620; 159 L Ed 2d 667 (2004). Instead, " '[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.' " *Campbell*, 329 Mich App at 205, quoting *Patane*, 542 US at 641. As a result, "[p]hysical evidence obtained as a result of an unwarned statement remains admissible as long as the statement was voluntary." *Campbell*, 329 Mich App at 205. Stated differently, "a *Miranda* violation does not necessarily involve the violation of the constitution, and, thus, the fruit of the poisonous tree doctrine enunciated in *Wong Sun* is not controlling where a *Miranda* violation is involved." *People v Melotik*, 221 Mich App 190, 199; 561 NW2d 453 (1997), citing *Wong Sun v United States*, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963). Thus, "[i]t is only the physical fruits of an actually coerced statement that must be suppressed to serve the deterrent purpose of the exclusionary rule." *Campbell*, 329 Mich App at 205, citing *Patane*, 542 US at 643-644.

In the present case, defendant contends police violated his rights under *Miranda* by continuing to question him even after he requested counsel. Defendant has not now, nor ever, contended his statement to police actually was involuntary or coerced. As the above cited caselaw makes clear, a mere violation of *Miranda* warrants exclusion of the statement to police as evidence, but it does not, on its own, require exclusion of physical evidence discovered on the basis of defendant's interrogation. *Tanner*, 496 Mich at 207-208; *Campbell*, 329 Mich App at 205, citing *Patane*, 542 US at 643-644. Considering the applicable, binding, and determinative caselaw on this issue, defendant's argument about excluding evidence discovered at Rappley's house as fruit of the poisonous tree simply fails. *Campbell*, 329 Mich App at 205, citing *Patane*, 542 US at 643-644. Consequently, for the reasons just discussed, this entire issue lacks merit.

## IV. VIOLATION OF MCR 3.606(A)(2)

Defendant submits the evidence seized at Rappley's house should have been suppressed as a fruit of the poisonous tree rooted in his illegal arrest warrant. We disagree.

### A. STANDARD OF REVIEW

"This Court reviews de novo questions of constitutional law and a trial court's decision on a motion to suppress evidence." *People v Brcic*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 359497); slip op at 3. Similarly, "[t]he proper interpretation and application of a court rule is a question of law that is reviewed de novo . . . ." *People v White*, 337 Mich App 558, 567; ___ NW2d ___ (2021).

### B. LAW AND ANALYSIS

The trial court properly applied binding precedent when deciding the exclusionary rule does not apply to violations of MCR 3.606(A)(2).

To properly analyze this issue, interpretation of the court rule is required. "We interpret court rules using the same principles that are applicable to the interpretation of statutes." *People v Davis*, 337 Mich App 67, 81; 972 NW2d 304 (2021). "When the language is clear and unambiguous, we enforce a statute according to its plain and ordinary meaning." *Id*. According to the plain language of MCR 3.606(A)(2), there must be "a proper showing on ex parte motion supported by affidavits" before a court can "issue a bench warrant for the arrest of a person" who

-9-

"committed [contempt] outside the immediate view and presence of the court . . . ." On appeal, the parties have agreed MCR 3.606(A)(2) was violated when the district court judge signed the bench warrant for defendant's arrest without requiring an affidavit. Considering the stipulation regarding violation of the court rule, the next issue to address is the effect of a violation of the court rule.

Defendant insists the trial court erred when it refused to apply the exclusionary rule to evidence connected to the violative bench warrant for his arrest. As discussed above, "[t]he exclusionary rule . . . reaches not only primary evidence that is obtained as a direct result of an illegal search or seizure, but also evidence that is discovered later and found to be derivative of the illegality, i.e., fruit of the poisonous tree." *Hammerlund*, 337 Mich App at 606-607. Stated differently, as relevant to the present case, " 'the indirect fruits of an illegal [] arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.' " *Id*. at 611, quoting *New York v Harris*, 495 US 14, 19; 110 S Ct 1640; 109 L Ed 2d 13 (1990).

Relying on this caselaw, defendant claims the evidence found at Rappley's home should have been suppressed in this case. Defendant reasons his arrest violated MCR 3.606(A)(2), which led to his interrogation, during which he told the police about staying with Rappley on occasion. Therefore, according to defendant, the police never would have discovered the evidence at Rappley's home if not for the improper arrest warrant. This argument fails.

The trial court relied on binding precedent from our Supreme Court regarding application of the exclusionary rule to violations of MCR 3.606(A)(2). In *People v Hawkins*, 468 Mich 488, 512-513; 668 NW2d 602 (2003), the defendant argued that evidence should be suppressed because the bench warrant did not comport with the court rule contrary to MCR 3.606(A)(2). Our Supreme Court began by noting, "[n]othing in the wording of MCR 3.606(A) provides any indication that the exclusionary rule should be applied to a violation of its affidavit requirement." *Hawkins*, 468 Mich at 512. The Court continued, "[t]o engraft the exclusionary rule—a harsh remedy designed to sanction and deter *police* misconduct where it has resulted in a violation of *constitutional* rights—onto the technical provisions of a *rule of court* in this manner would extend the deterrent well beyond its intended application." *Id*. at 512-513. Our Supreme Court then identified the following important distinction: "Indeed, the task of scrutinizing the police papers submitted in support of a warrant for technical compliance with the law falls squarely with the judicial officer." *Id*. at 513. The *Hawkins* Court deemed the distinction to be important because it differentiated between judicial and police misconduct. *Id*. The Court concluded, "[i]n the absence of language evincing an intent that suppression of evidence should follow from the violation of MCR 3.606(A), we decline to infer one." *Hawkins*, 468 Mich at 513.

In sum, our Supreme Court held the exclusionary rule did not apply to violations of MCR 3.606(A)(2). Defendant attempts to circumvent this holding by claiming the Court in *Hawkins* only addressed a "technical" violation of the court rule. While the opinion did reference a judicial officer's duty to ensure "technical compliance" with the law, the Court did not specifically state its holding applied only to "technical" violations of the court rule. Instead, in a footnote, the Court stated the prosecution stipulated the bench warrant for the defendant's arrest in *Hawkins* had not complied with MCR 3.606(A)(2). *Hawkins*, 468 Mich at 512 n 25. The prosecution has done the same in this case. Moreover, the Court's opinion clarified any confusion when it stated, in broad terms and without reference to "technical" violations, "MCR 3.606(A)

-10-

does not provide for suppression of evidence on the basis of noncompliance with its affidavit requirement, and we decline to infer an intent that the exclusionary rule should apply under these circumstances." *Hawkins*, 468 Mich at 513. When there is "noncompliance with [the] affidavit requirement" of MCR 3.606(A)(2), the exclusionary rule does not apply. *Hawkins*, 468 Mich at 513. Because defendant's argument relies on application of the exclusionary rule, this issue must fail. *Id*.

## V. PROSECUTORIAL MISCONDUCT[10]

Defendant contends the prosecutor committed misconduct during trial by denigrating the defense and relying on inadmissible testimony. We disagree.

### A. PRESERVATION

In cases alleging prosecutorial misconduct, issues are "preserved by contemporaneous objections and requests for curative instructions . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). In this case, defendant objected to the alleged improper closing argument by the prosecutor, which the trial court overruled. As a result, this issue is considered preserved for our review. *Id*.

### B. STANDARD OF REVIEW

"Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). Because this issue is unpreserved, we must review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014).

### C. LAW AND ANALYSIS

The prosecutor did not commit misconduct during closing arguments.

"A prosecutor 'is the representative . . . of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *People v Evans*, 335 Mich App 76, 89; 966 NW2d 402 (2020), quoting *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 2d 1314 (1935). "We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014). "Generally, '[p]rosecutors are accorded great latitude regarding their arguments and conduct.' " *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation omitted). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the

---

[10] We employ the phrase "prosecutorial misconduct" as a term of art synonymous with "prosecutorial error," not as an indication that the prosecution engaged in intentional misconduct. *Jackson*, 313 Mich App at 425 n 4.

case." *Id*. (quotation marks and citation omitted; alteration in original). In making those arguments, "[t]he prosecutor need not speak in the blandest of all possible terms." *Blevins*, 314 Mich App at 355 (quotation marks and citation omitted).

"A prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury." *People v Clark*, 330 Mich App 392, 435; 948 NW2d 604 (2019). "Such an argument implies that defense counsel does not believe his own client, which undermines the defendant's presumption of innocence." *Schrauben*, 314 Mich App at 192. Further, this type of "argument impermissibly shifts the focus from the evidence itself to the defense counsel's personality." *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010) (citation omitted). "Additionally, a prosecutor's remarks, which might be improper in his closing statement, may be proper when offered to rebut an argument proffered by the defense in closing." *Clark*, 330 Mich App at 435. However, "it is not improper for a prosecutor to comment on the weakness of a defense theory." *Id*.

In the present case, the defense focused on convincing the jury the police had failed to properly investigate the case and missed Christopher as a potential suspect. During her closing argument, Wilson spoke at length about this topic. During the cross-examination of witnesses, the defense wanted the jury to question why the police did not test certain evidence for Christopher's DNA considering he admittedly brought a baseball bat over to the Zrakovi house on the night of the murder. In contrast, on rebuttal, the prosecutor sought to undermine the defense's theory of the case by identifying the evidence connecting defendant to the murder and the dearth of such evidence related to anyone else. After summarizing the evidence, the prosecutor made the following argument, which defendant now challenges on appeal:

> I brought up to you every piece of evidence that fits into place that shows that the defendant is a person who committed this homicide. You heard from the officer that had there been a lead in any other direction, any direction whatsoever, it would have been followed up on, but there wasn't. Because no matter what they did, every little piece kept pointing straight at [defendant].
>
> And I'm sorry, but if that many pieces add up and that many pieces are fitting together and that many things fall into place, it cannot be a coincidence because, if so, he is so unbelievably un[lucky] that I do not even want to be in a room with him right now because he is going to get struck by lightning in the next 10 seconds.

Defendant contends this portion of the prosecutor's closing argument was improper for two reasons. First, he argues the prosecutor improperly relied on inadmissible testimony from Detective Sergeant Bryce Willoughby. Pertinently, defendant claims Detective Sergeant Willoughby offered an opinion regarding defendant's guilt, which the prosecutor then adopted in the closing argument. Preliminarily, we must consider whether Detective Sergeant Willoughby's testimony actually was improper. Defendant is correct that, generally, "a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense . . . ." *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) (quotation marks and citation omitted). Defendant contends Detective Sergeant Willoughby violated this rule during the following testimony:

-12-

*Q*. And, again, did your investigation ever point you in any other direction than [defendant]?

*A*. No. I did not ever discover any other individual. I did not discover exculpatory evidence indicating that it in fact was not the defendant. Every item, and I'm referring again to the multitude of bats that were recovered, were collected and processed and it all came back to [defendant].

Although defendant asserts this was an opinion on the ultimate issue of defendant's guilt, Detective Sergeant Willoughby merely answered a question about whether there was evidence pointing to other potential suspects. Importantly, this question from the prosecution occurred on redirect examination. During cross-examination, Wilson repeatedly inquired of Detective Sergeant Willoughby, as the officer-in-charge of the case, why he did not further investigate Christopher. On redirect examination, then, Detective Sergeant Willoughby simply was clarifying his reasons for not doing so—he did not believe any evidence pointed to Christopher as a possible suspect. Indeed, Detective Sergeant Willoughby went slightly further and stated there was no evidence suggesting *anyone* else committed the crimes at issue in this case. However, an objection is not necessary when, fairly read, the officer's testimony was not designed to render an opinion about the defendant's guilt, but to delineate the steps taken in the investigation and to explain personal perceptions. See *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). Consequently, this argument by defendant lacks merit. Because the evidence was admissible, the prosecutor was free to argue it. *Bahoda*, 448 Mich at 282.

Second, defendant argues the prosecutor's argument improperly implied the defense was purposely trying to mislead the jury. As just discussed, such an argument is not permissible. *Clark*, 330 Mich App at 435. But reading the argument in context, it is clear the prosecutor was not actually attempting to denigrate the defense in any manner. Instead, the prosecutor was commenting on the weakness of the defense's theory of the case, which is permitted. *Id*. Pertinently, the prosecutor argued that if Christopher actually committed the murder the investigation would have produced at least some evidence of Christopher's involvement. Considering there was no such evidence, and there was a mountain of evidence, including defendant's DNA on the sewer cap presumably used to break the back patio door and Chadwell's blood on defendant's shoes found at Rappley's home, the prosecutor's argument was appropriate. While the prosecutor's comparison to lightning striking defendant within 10 seconds is questionable, our caselaw is clear a prosecutor "need not speak in the blandest of all possible terms" when arguing the case. *Blevins*, 314 Mich App at 355 (quotation marks and citation omitted). Importantly, though, the prosecutor's argument did not contain any specific claim Wilson or defendant were specifically trying to mislead the jury. Thus, the prosecutor's vigorous advocacy was a commentary on the evidence and its lack of support for the defense's theory of the case, not an accusation of deliberately misleading the jury. *Clark*, 330 Mich App at 435. Thus, there was no plain error related to the prosecutor's closing argument identified above. *Id*. Because defendant's allegations of prosecutorial misconduct lack merit, there is no support defendant was denied a fair trial. *Dunigan*, 299 Mich App at 588.

-13-

## VI. TESTIMONY REGARDING HAIR

Defendant alleges Detective Sergeant Willoughby's testimony that the hair found in Chadwell's hand looked like Chadwell's own hair was improper lay opinion testimony. We disagree.

### A. STANDARD OF REVIEW

This Court "reviews for an abuse of discretion a circuit court's decision to admit or exclude evidence." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019) (quotation marks and citations omitted).

### B. LAW AND ANALYSIS

The trial court did not abuse its discretion by allowing Detective Sergeant Willoughby to testify about the hair in Chadwell's hand. Under MRE 701,

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Stated differently, "the admissibility of [a lay] opinion is governed by MRE 701, which allows opinion testimony by a lay witness if it is rationally based on the perception of the witness and helpful to a clear understanding of a fact in issue." *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994). Such lay opinion testimony, however, cannot "invade the province of the jury." *Fomby*, 300 Mich App at 52. Consequently, "when a witness is in no better position than the jury to make an identification from a video or photograph, the testimony is inadmissible" as a lay opinion. *Id*. at 53, citing *United States v Rodriguez-Adorno*, 695 F3d 32, 40 (CA 1, 2012).

Defendant challenges Detective Sergeant Willoughby's testimony about the bloodied hair found in Chadwell's hand. The crux of Detective Sergeant Willoughby's lay opinion was the hair in Chadwell's hand looked almost identical to Chadwell's own hair. This opinion, notably, undercut defendant's theory the hair in Chadwell's hand belonged to Chadwell's actual murderer, considering it did not look like defendant's hair. There appears to be no dispute Detective Sergeant Willoughby's opinion was "rationally based on [his] perception" of the evidence and Chadwell's hair. MRE 701. Defendant, however, insists Detective Sergeant Willoughby's opinion testimony was inadmissible because it invaded the province of the jury. *Fomby*, 300 Mich App at 52. Pertinently, defendant believes the jury was in an equal position with Detective Sergeant Willoughby to be able to properly identify the hair, and thus, Detective Sergeant Willoughby's testimony was not helpful to the jury. *Id*. at 52-53.

The trial court did not abuse its discretion in deciding otherwise. In *Fomby*, 300 Mich App at 52, this Court held a police officer's opinion about the identification of individuals in a surveillance video was helpful because the police officer in question had watched the video on a number of occasions. Relevantly, the *Fomby* panel opined:

> Because it can be inferred that [the officer] viewed the surveillance footage and still photos several times to reach his conclusions and opinions, it can similarly be reasonably inferred that [the officer's] testimony helped the jury to correctly and efficiently determine whether the two individuals seen earlier in the footage were the same individuals who were involved in the murder later depicted in the video. [*Id.*]

Therefore, even though the jurors were capable of watching the surveillance footage themselves and deciding if the suspects appeared in it, the officer's testimony still was helpful because he had studied the video before appearing at trial. *Id.*

In this case, jurors were permitted to look at photographs of the hair in Chadwell's hand, along with photographs of Chadwell's actual hair. They could have, then, made the comparison themselves. However, as noted in *Fomby*, this does not automatically render a witness's opinion inadmissible. Detective Sergeant Willoughby, unlike the jurors, was at the crime scene when Chadwell's body was still inside the Zrakovi house. Detective Sergeant Willoughby also attended the autopsy, which allowed him to personally observe both the collection of the hair in Chadwell's hand, and Chadwell's own hair. As a result, Detective Sergeant Willoughby was in a better position than the jurors to compare the hair in Chadwell's hand and the hair on his head. Consequently, Detective Sergeant Willoughby's opinion was "helpful to . . . the determination of a fact in issue;" namely, whether the hair in Chadwell's hand belonged to someone other than Chadwell. MRE 701. Thus, contrary to defendant's arguments, Detective Sergeant Willoughby's testimony did not "invade the province of the jury." *Fomby*, 300 Mich App at 52.

Defendant also presents a confusing argument related to Detective Sergeant Willoughby's experience and qualification as an evidence technician. Defendant suggests Detective Sergeant Willoughby used this qualification to bolster his credibility regarding his comparison of the hair found in Chadwell's hand with his own hair. But the record, plainly viewed, does not support this contention. "As the appellant [], defendant [bears] the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). In reviewing Detective Sergeant Willoughby's testimony, it is clear he only referenced his experience and training as an evidence technician to describe various parts of his investigation. When he discussed the hair found in Chadwell's hand, though, Detective Sergeant Willoughby only relied on his own power of observation. He did not state his opinion was formed on the basis of any expert training or experience. Detective Sergeant Willoughby never claimed his training as an evidence technician helped him to determine, or provided any guidance to help form, his opinion that the hair in Chadwell's hand came from his own head. Briefly, then, the record simply does not support defendant's claim of error related to Detective Sergeant Willoughby's training as an evidence technician. *Id.* Because defendant bore the burden to provide a record supporting this ground for reversal, and he has failed to do so, this argument necessarily fails. *Id.*

In short, the trial court did not abuse its discretion by admitting Detective Sergeant Willoughby's lay opinion testimony about the hair in Chadwell's hand.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Anica Letica
/s/ Michelle M. Rick